I believe this case presents a unique issue, the facts underpinning which I have not been cooperating co-defendant witness who, during the witness's cross-examination, is allowed by the district court to consult with his own counsel. You put it forth in the way of a confrontation clause violation, and I don't find any cases that support that theory. What I see here is a sequestering of witnesses issue, but there was no limitation on the cross-examination. He testified at one point, they took a break during the noon hour, then he came back, and he was cross-examined. So there was no restriction of cross-examination. I'm having difficulty in finding anything to support that there's a confrontation violation. Well, Your Honor, I submit that the right of confrontation would be meaningless if that did not encompass the right to cross-examine, to vigorously cross-examine a witness. But he didn't even – but in the afternoon, there wasn't even – he had – I think that the witness admitted some inconsistencies in the morning, and then there wasn't any further cross-examination of that in the afternoon. So, I mean, counsel wasn't restricted and didn't ask any questions along those lines. Well, Your Honor, I submit that once the witness was permitted to consult with counsel during the cross-examination, that effectively ruined defense counsel's opportunity to cross-examine the witness. All your strategy that goes into these things, you know, the old saying from back in law school, I suppose, Irving Younger, you never ask a question. Well, okay, let's assume that we buy that for a moment, or, you know, but let's say that there's an order that witnesses can't talk to other witnesses or something along those lines. But here you have a cooperating witness, so also if the cooperating witness doesn't live up to whatever the plea bargain is, then the cooperating witness doesn't – so that's why the cooperating witness has a lawyer, right? That's correct. So, if we accept your position on this, then you would say that someone in that position could not even get legal advice from their lawyer as to whether something would be a violation of the plea agreement? Well, I think that's – I mean, if you were that lawyer, if you were that defense lawyer representing that witness, I think I can hear your argument saying, Your Honor, you can't tell me not to talk to my client. My client – you know, if my client, you know, has a question about whether, you know, he is testifying truthfully, he has a right to ask me, or what exactly the parameters are of that. Your Honor, I think that this opens up a Pandora's box of ethical problems for counsel representing cooperating witnesses, for one thing, and that's another reason why I think the rule is the witness does not have a right to speak to his lawyer during his cross-examination. That is exactly what the cases say. The district court says that. Well, Perry v. Leek says that he does not have – even an accused does not have a right to speak with his lawyer during cross-examination. Here, the district court said he has a right to speak to his lawyer at all times. So if I can go back just a bit to the – to the ethical dilemmas that I think this opens up. If you represent that cooperating witness – So, is there – I mean, is there a case that during the lunch break a defendant cannot talk to his lawyer if he's taken the stand? Your Honor, there are cases that have held that it is appropriate for the trial court to restrict the ability of even the accused to speak with his lawyer during a recess in the trial. I mean, Perry v. Leek says as much. Now, it talks in terms of – and again, the underpinning of that decision is cross-examination. The guts of the confrontation clause is cross-examination. That's the heart and soul of any defense in a criminal case, is to be able to cross-examine, as you know, the government's witnesses. Let's suppose that we – we have a rule that says, well, certainly a cooperating witness ought to be able to talk to his lawyer during – during his testimony. Well, as – if I'm cooperating witness as counsel then, certainly I can't advise my client to say things that aren't true. We all know that. But can I – I've been sitting in the courtroom watching. Can I – can I say to my client, hey, you know, the prosecutors can't talk to you, but, you know, I – I think that maybe you need to go in a little different direction with this aspect of your testimony, or perhaps you need to say this in a different way than you did before. I mean, it's – it's as if the prosecutors are able to coach the witness or talk – give the witness advice during cross-examination. And it's universally recognized that the effectiveness on cross-examination is premised on the idea that that witness doesn't know, may not know what's coming, may not expect. That – that's the whole point. And – and in this case, the district judge allowed the witness to do that, to talk to his lawyer. And the other – the other problem here is, how does a defendant demonstrate prejudice in a case like this? How do you – I – I submit that it's not even amenable to – to typical Chapman analysis, because – because of the intangibles involved. How – how do you know – how do we know, based on the record, what this witness would have said? How do we know what was talked to the – what the witness was talked to about? And again, you know – you know, the very first topic that the prosecutor did counsel ask in the afternoon, you talk to your lawyer? In the – in the cross-examination? Right. No. Well, wouldn't that be one way that we could start that dialogue? Well, I mean, wouldn't – you know, you could say, well, you had a – you know, they might be able to object as to the nature of what was talked about, but could say, well, did you talk to your lawyer during the noon hour? Well, yes, I did. You know? Well, that's a double-edged sword, because now you – now you – now you're enhancing their witness's credibility. Well, he's had a chance to talk to his lawyer. He must be telling the truth. I mean, you – I'm not sure I want to ask that question. But again – again, a trial lawyer has to be able to cross-examine the state – the government's star witness. And this wasn't just any witness here. This was a trial lawyer. So – well, I guess I'm trying to – you know, I'm not trying to put you in a trick bag here, but you're saying on the one hand, okay, I don't have to show prejudice. How can I show prejudice? Well, it would seem to me that one way of showing prejudice would be to establish that there was a conversation during the noon hour and ask, did – were you advised to change your testimony or anything along those lines? And there was no – there wasn't – the witness had already admitted an inconsistency in the morning, but there wasn't any revisiting of that in the afternoon. Your Honor, I submit that in the – in the heat of battle – Well, I know. I've been there. That may not – that may not be a good place for you to go as defense counsel. Did you have a chance to talk to your lawyer during the break? I just – Well, you might get an answer that you don't like, but on the other end, you still do have the – you still have some burden to show prejudice. I don't think we can say that just because it's hard to show prejudice, you don't have to show prejudice. Your Honor, I submit that it's impossible for – in this – under these facts, to make a concrete showing of prejudice. I think it's not amenable to Chapman-type error. I think it was a – I don't know if I should call it structural error or not, but I think it did – it did significantly impinge upon the right of the accused to effectively cross-examine the government's star witness. I suppose I would move on then to the sentencing phase of the trial, and I'd like to talk about the issue of the verdict form. And the Court, earlier this morning, I heard some discussion in one of the other cases, and I agree with the counsel in that case. I haven't come to hear you. Would you speak a little louder? I'm sorry. I'm hearing you.  Well, except for – I think this sort of goes back to – you were sitting out there, but will Judge Canby's argument on the last case in terms of, by making the sentencing guidelines discretionary, didn't the Supreme Court in Booker allow the district court to make drug quantity determinations for sentencing purposes, and isn't the only requirement that the defendant be sentenced within the statutory maximum? Well, it's hard to refute that. However, I still think there's an issue out there concerning the effect of Blakely on the sentencing guidelines. I don't think we know all the answers to some of these issues yet. Maybe in the first Monday in October when we find out the cert grants from the district court in the summer, maybe we'll know a little bit more where we're going with this, but I think the – there's still a Blakely problem, and there's still a problem about how does the district court – what standard does the district court use to make these factual findings. In this case, the court – it sounds like – he doesn't exactly say what standard he's using. It sounds like a preponderance to me. But my argument, of course, is that the jury effectively acquitted Mr. Vargas-Gallegos of anything in excess of three pounds. They certainly could have filled in any amount they wanted on that verdict form, and we know that that's what they found. Well, I have a question on that. That – the special verdict, isn't it just a finding of whether there was three pounds or not? It's not – I've never heard of the, you know, find how many pounds. Well, that's what it asks. It asks them how many. Well, is this satisfied as three pounds? So that says they found three pounds. It doesn't say whether they found 30 or whatever, however many they found, but they found three. So then we know that that enhancement's found by virtue of the jury. That's all we know. All we know is that they found, beyond a reasonable doubt, that there were at least three pounds. And that enhancement accounts for how much time? Well … Is that 60 months? There's a two-level difference between three pounds and, believe it or not, 30 pounds. It seems odd, but that's the difference. It would have been a two-level difference based on 2D1, whatever it is. So, but again, I just – I find it hard to square with just the plain language of Blakely, which is that if any fact, other than the fact of a prior conviction that is not admitted to by the defendant or found by the jury, cannot be used to enhance the sentence. Now, I know there's an issue about whether that applies only to the statutory or the guidelines, but I submit that we don't – I think that the jury's still out on some of these questions. And I would like to kind of wrap or tie this up with or relate this to the problem of the cross-examination. They are related because this Mendoza-Ricos testimony permeates the entire case. It's also the main basis for the severity of the sentence. I mean, the district court's statement that Mr. Vargas-Gallegos is a main player in this case, I mean, I know it's not for you, Your Honors, to sit here and re-weigh the facts, but if you look at the evidence of record in this case, the only source – the only corroboration for that, that he's a main player, is in fact from Mendoza-Rico. Is that, though, what would we be doing if we said we would have done it differently? I mean, we have to – I mean, what's the standard of review for that on the minor  Verrilli, on the – as it affects the sentencing? Mm-hmm. Well, I mean, the standard of review, if it's a finding of the facts, it's clear error. But I submit that even under clear error, the evidence – the evidence to support sentencing conclusions, whether we're talking about Blakely or Booker or whatever, it certainly, we all agree, has to be reliable. And to sentence my client, Mr. Vargas-Gallegos, to this type of sentence based on the uncorroborated testimony of this person, Mendoza-Rico, an admitted murderer, is unconscionable. And I can't really talk about the effect of the cross-examination during the trial without also hearkening to the – hearkening forward, if you will, to the sentencing, where the statement, the district court statement that my client was a main player, the only source of that is – the only evidence of that is Mr. Mendoza-Rico. All right. I reserve the remainder of my time.  Thank you. Good morning, Your Honors. My name is Lynn Lamprecht. I'm an assistant U.S. attorney from the District of Idaho. With regard to the confrontation clause, the defendant has argued that it is virtually impossible to show prejudice in a case like this. Let me ask you one thing first. The district court said that he could not keep Mendoza from speaking with his attorney during the lunch break. Is that a correct statement of the law? No. It's my understanding that under Perry v. Leak, it's discretionary whether – well, under a 15-minute break, under a close break like that, under Perry, it would be discretionary with the district court as to whether or not he wanted to allow a witness, particularly in that case a defendant witness, from consulting with counsel. In this case, we don't have a defendant witness. We have a slightly longer break for the lunch break. The court – the issue, of course, under Gators has been decided that overnight a defendant certainly has a right to consult with counsel. So the issue becomes whether – where the one hour falls in that category. So the district court made an incorrect statement of the law when the district court said that? That's probably correct. And so we're reviewing the district court for what? Abuse of discretion? If it is abuse of discretion, perhaps. But since the constitutional issue of the Confrontation Clause was not raised by the defense attorney at trial, we would submit that the standard of review for this instance is plain error. Under either standard, we don't believe a defendant can show prejudice in this regard. The defense – You said, how could he? That's his argument. Oh, well, there's several ways. He did not, as the court, of course, pointed out, he did not question the witness as to whether he had been able to consult about his trial testimony. Now, he did ask the witness that in the first, in his morning cross-examination. Well, he said, you've talked to the prosecutor about your testimony in this case, haven't you? When they came back after the break, the defense attorney did not ask the witness if he had consulted with his own attorney or had any consultation with the prosecutor about this issue. He also didn't ask the judge if he was concerned about prejudicing the jury, if he could have a voir dire outside the presence of the jury to see what, if anything, had occurred between the witness and his attorney. This record is absolutely devoid of anything happening, as counsel suggests may have happened, because there's just nothing – although the court said, yes, you have the right to consult with your attorney, there's nothing to show that he did consult with his attorney. There's nothing to show that if he did consult with his attorney, what he and his attorney talked about, and there's nothing to show. Isn't some of this going to be privileged? I mean, how are you – Well, that's why I would suggest outside the – What did your attorney advise you? Yes, sir. I'm sorry. Yes. No, I mean, the question, you're supposed to say, what did your attorney advise you? I mean, I – I think that the Court pointed out that if it was a privileged matter, of course, it wouldn't be, you know, communicated. But the thing is, is if there were a voir dire, certainly the defendant's attorney could have said, we talked about – we didn't talk about the testimony, we did talk about the testimony, we talked about privileged matters, which I can't reveal, or we didn't talk about anything. Is there any evidence that his testimony changed on the afternoon? Well, that was the last thing I wanted to get to. There really isn't any evidence. It was at the end of direct examination that the defendant admitted he had told Quintero that he got the gun from Angel, I believe. But he also said – and then the prosecutor said, well, was that true? And he said, no, I got it from Vargas, the defendant. It really wasn't asked about then on cross-examination. In fact, on cross-examination, what the defendant did, he didn't ask about – So he's not only a murderer, but he admits being a liar on direct. He admits being a liar on direct examination. That's correct. As to that, that he hadn't – that he had gotten the gun from Vargas, not Quintero, although he had told his jail cellmate this. Now, under oath, there's no – there's nothing to suggest that he lied under oath. What was his deal exactly? What was his deal? What was Mendoza's deal that he got? He got 30 years. It was a 5K, 1.1 deal. I was not the trial counsel. Was it that he – was it on condition that he testified truthfully, or what was the – what was the – Yes, Your Honor, it would have been on condition that he testified truthfully. I was not trial counsel. I do not know what the deal was, but all of our deals are that he tell the whole truth and that it be truthful for him to get any kind of a 5K, 1 at all. In any event, counsel says that he was prejudiced because he wasn't able to explore the fact that the defendant – defendant's, you know, contradictory statement as to whom he got the gun from. In fact, it doesn't matter because the defendant was acquitted of that. So counsel, apparently, whatever he did, was able to show the jury. And we submit that that was – he got Mendoza to say in cross-examination that basically he decided to kill him on the spur of the moment. But he went out and he got the gun and went back in and became extremely angry and made the decision then to shoot him. So it would have been very hard for someone else to join in the plan. Defense counsel's question was, and you got the gun from Vargas, the defendant. And he said yes. And that's what's a record under oath. And I would point out at sentencing that the judge did credit Mr. Mendoza's statement. The judge listened to all the witnesses, and he decided that Mr. Mendoza was credible. Up to that point. It's an interesting – it was an interesting deal. I mean, we see all these things where you get – you get somebody to cooperate so you can get somebody that you really want to get. And here you take the kingpin of the operation and he's committed a murder and make a deal with him in order to get somebody who's clearly less important. It's probably not an optimal solution for a prosecutor to work down like that. But, of course, it does happen. He also – defense counsel also argued in his brief that it impaired his ability to ask Mendoza about his client's minor role on cross-examination. But the record shows that he never asked Mendoza about any kind of a minor role. He did elicit testimony instead that his client owed Mendoza money, which was corroborated by – actually by his own client's eventual statements to law enforcement officers. And there was no – whatever he wanted to do with the minor role, he didn't try to do with Mr. Mendoza, and it had nothing to do with an hour-long lunch break. So we would just submit that the record does not support this argument, nor does what actually occurred in trial on cross-examination of the defendant. I'm sorry, of Mr. Mendoza. Defendant did not take the stand. As far as the minor role issue, counsel very interestingly argues that the judge did not award the minor role adjustment based simply on Mr. Mendoza's uncorroborated testimony that the defendant was a major player, basically. And what's interesting about this argument is that the defendant's basis for arguing that he should have received a minor role is based only on self-serving, minimizing statements his client made to law enforcement officers during the course of their investigation. His client did not testify under oath. His client was interviewed the first time when the investigation was beginning, and he flatly denied ever even being at the ranch on the day of the homicide. I believe the record shows that they talked to Mr. Vargas, the defendant, four times before he admitted anything other than just knowing the participants. And it wasn't until Mr. Vargas was placed under arrest and charged with being an illegal alien and given his Miranda warnings that he started to try and say, okay, well, yes, I knew what was going on, but I was only an onlooker. I might have acted as a lookout, but I didn't really do anything. And as the trial court noted, at the same time, he knew everything about this drug business, this drug distribution business, right from where it started in Tijuana, Mexico, how it got into the United States, how it was transported to Idaho, the amount that Mendoza was charging his clients, how often Mendoza came to the ranch with his deliveries. And, of course, after Mendoza killed Pegas, he was able to go into the basement of this house, open the safe, take out six packages of drugs, two packages of money, and a gun, and leave. So I think the judge's finding that this was a main player and that it would be naïve to think that he was anything else is clearly supported by the record in this case. We actually have no other argument unless you have questions, Your Honor. The panel does not have any questions. Thank you. Thank you. Then we would simply ask that the conviction and sentence be affirmed in all respects. First of all, Mr. Vargas-Villegas did not say that he owed money to Mendoza. That all comes from Mendoza. The different people owe him money, not from Mr. Vargas-Villegas. Second. Was there, who were the other witnesses that testified at the trial? Well. Was there an Arradondo? The other non-police witnesses were Pablo Arradondo, Mendoza Rico. There were two other lay witnesses, but I think I'd be safe in saying that the two most important fact witnesses are Mendoza Rico and Arradondo. So what did Arradondo say? Well, Arradondo corroborates that they cleaned out the milk barn in the house after the shooting, and that Mr. Vargas-Villegas was involved in that part of it. And one of the interesting things about that is that the amount of drugs that he seems to recall is two pounds and then some bags. So I think it's certain that that's close to a three pound amount. And going back to the point about the sequestration issue, all these suggestions here that the defense counsel can order the witness and find out what they talked about. I think as Judge Canby pointed out, there's some problems with that. Not only that, but here you are in the midst of the most important part, maybe, of a trial. And when defense counsel prepares for trial, or any counsel in any lawsuit, civil, criminal, I don't care, the most important part of what you do is your preparation for cross-examination. Your cross-examination might last five minutes, but you may spend more time thinking about that and preparing for that. It's the most important arsenal, weapon in the defense arsenal. And when you interrupt that in the middle, after he's had a chance to know where you're going, or might think he knows where you're going, you interrupt that and you give him an opportunity to talk to his lawyer, to talk to somebody else, to talk to, you know, to get some advice. So just so that I understand this, was the interruption in the middle of cross, or before cross started? It was shortly after cross had begun. It was during his cross-examination. And after the lunch... How long was the end of cross? You mean the post-lunch cross? No, well, no, before lunch. You said cross had started before lunch? Yes. And how much? I'm going to just guesstimate here. This is hard to do. I'm going to guesstimate it was about one-third of the way. Now, notably, the first topic of the prosecutor's redirect after cross was this argument about who gave the gun to Mendoza Rico. And the centerpiece of the government's case, if you will, on the homicide aspect of this was that it was Mendoza, my client, Vargas Villegas, who had given Mendoza the gun. So, yes, that was a vitally important fact in terms of his role, if any, in the murder. But it also was important vis-a-vis his ranking, if you will, with Mendoza Rico. It makes it look like he's, even if he didn't give him the gun, that he's part of that whole operation. The jury could well, and I'm sure that they did, they couldn't find beyond a reasonable doubt that he was involved in a murder. But it's still very quite damning evidence in terms of his role in this thing. What was his, you know, how foreseeable were all these other transactions? How much, how close was he to Mendoza Rico? He's got his gun. So I think it goes. Well, okay, on the Arredondo, did he also testify that the gun came from Vargas? Yes, he did. Right. Isn't that a little bit of a problem for you? Well, it is. Fortunately, the jury didn't find that. I don't know. Well, I'm thinking it's a problem on the prejudice and it's a problem on the minor role. Yes. Because then that moves it out of, if you're showing prejudice in that, you know, the cross-examination of Mendoza, but if another witness who didn't have any issues with this cross-examination or whether, if you want to call it a confrontation or a sequestering, a sequestration issue, that Arredondo doesn't help you on that argument. No, he doesn't. Whether he gave him the gun or not, I don't think the jury felt that was enough to link him, to convict him of murder. Well, it is sort of a good news, bad news. He wasn't convicted of murder, but he was convicted of things that amounted to serving as much time for murder probably or as the murderer. It only serves to highlight just how extraordinarily tricky and difficult the cross-examination of this Mendoza Rico was, and that should not have been interfered with. See, I guess you said the lunch break, you have to have probably. So cross-examination is going to be interrupted that way, and what you object to is being able to speak to his attorney. And you're saying, well, the cross-examination, the beauty of cross-examination as a weapon is that the person being examined doesn't know the direction you're going, but there's no evidence. It's not apparent, let's say, from the pre-lunch cross-examination that some sort of fine trail was being laid that got sidetracked by a consultation at lunch. I mean, what surprises were being sprung that could be compensated for in this afternoon testimony? Your Honor, I think that's exactly the problem. I don't know how you gauge it. I just know that the judge incorrectly, it's not an abuse of discretion, he incorrectly said that this man had a right to speak to his lawyer anytime he wanted to. That was incorrect. So your position would be that when a witness is being cross-examined, the judge on request has no discretion. He has to sequester that witness from an attorney. No, that's not my position. But in this case, the judge said he didn't say in terms of, well, I'm going to weigh the facts and sort of take the temperature and make a decision. He said he didn't frame it in terms of discretion. He stated he has a right, and that's clearly not the case. So with that, I'll stop, and I would pray that we put an end to this matter. Thank you both for your argument in this matter. Thank you. The matter will stand submitted. The Court's just going to take a brief recess. We'll be in recess between 5 and 10 minutes, and then we'll resume with the next case on calendar. All rise. This Court stands in recess. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Canby, Hall, Callahan